*PRELIMINARY PRINT*

VOLUME 604 U. S. PART 2
PAGES 458–517

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MARCH 26, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# BONDI, ATTORNEY GENERAL, ET AL. *v.* VANDERSTOK ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 23–852.   Argued October 8, 2024—Decided March 26, 2025

The Gun Control Act of 1968 (GCA) requires those engaged in importing, manufacturing, or dealing in firearms to obtain federal licenses, keep sales records, conduct background checks, and mark their products with serial numbers.   The Act defines "firearm" to include "(A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [and] (B) the frame or receiver of any such weapon."   18 U. S. C. § 921(a)(3).   Recent years have witnessed profound changes in how guns are made and sold, with companies now able to sell weapon parts kits that individuals can assemble into functional firearms at home.   These kits vary widely in how complete they come and in how much work is required to finish them.   Sales have grown exponentially, with law enforcement agencies reporting a dramatic increase in untraceable "ghost guns" used in crimes—from 1,600 in 2017 to more than 19,000 in 2021.

In 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) adopted a rule interpreting the Act to cover weapon parts kits that are "designed to or may readily be converted to expel a projectile," 27 CFR § 478.11, and "partially complete, disassembled, or nonfunctional" frames or receivers, § 478.12(c).   Before ATF could enforce its rule, gun manufacturers and others filed what they described as a facial challenge under the Administrative Procedure Act, arguing that the GCA cannot be read to reach weapon parts kits or unfinished frames or receivers.   The District Court agreed and vacated the rule.   The Fifth Circuit affirmed, holding that § 921(a)(3)(A) categorically does not reach weapon parts kits regardless of completeness or ease of assembly, and that § 921(a)(3)(B) reaches only finished frames and receivers.

*Held*: The ATF's rule is not facially inconsistent with the GCA.   Pp. 467–484.

(a) Section 478.11's provisions addressing weapon parts kits are not facially invalid under § 921(a)(3)(A).   That subsection contains two requirements: a "weapon" must be present, and that weapon must be able to expel a projectile by the action of an explosive, designed to do so, or susceptible of ready conversion to operate that way.   Some weapon parts kits meet that description.   Consider, for instance, Polymer80's "Buy Build Shoot" kit, which contains all necessary components to build

a semiautomatic pistol and can be assembled in about 20 minutes using common tools. That kit qualifies as a "weapon" because: (1) artifact nouns like "weapon" often describe unfinished objects when their intended function is clear, as with a disassembled rifle; (2) the statute treats starter guns as weapons though they require conversion work; and (3) the statutory text contemplates that some things short of fully operable firearms qualify as "weapons." The kit also satisfies the statute's second requirement, as it requires no more time, expertise, or specialized tools to complete than a starter gun, which the statute treats as readily convertible into a functioning firearm. While other kits may be so incomplete or cumbersome to assemble that they cannot fairly be described as weapons capable of ready conversion, the facial challenge fails because kits like Polymer 80's clearly qualify. Pp. 467–477.

(b) Section 478.12(c)'s treatment of partially complete frames and receivers is also not facially invalid under § 921(a)(3)(B). Like "weapon," the artifact nouns "frame" and "receiver" may describe not-yet-complete objects. The statute uses these terms to encompass some unfinished items elsewhere, as in § 923(i)'s serialization requirements for incomplete weapons, silencers, and destructive devices. ATF has for decades interpreted the statute to reach some unfinished frames and receivers, and even the plaintiffs concede they have no "quarrel" with ATF's prior practice of regulating those products. Accordingly, the statute authorizes ATF to regulate at least some incomplete frames or receivers that take minutes of work with common tools to complete. While other products may be so far from finished that they cannot fairly be described as frames or receivers, the facial challenge fails because the statute plainly reaches some partially complete items. Pp. 477–481.

(c) The plaintiffs' arguments about the linguistic differences between subsections (A) and (B) and potential unintended consequences under the National Firearms Act (NFA) are unpersuasive. The government represents that AR–15 receivers do not qualify as machinegun receivers, and this Court's analysis of the GCA does not suggest ATF has authority to regulate them as such under the NFA. Pp. 481–484.

(d) Neither the rule of lenity nor constitutional avoidance applies where, as here, the statute's text, context, and structure make clear it reaches some weapon parts kits and unfinished frames or receivers. P. 484.

86 F. 4th 179, reversed and remanded.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. SOTOMAYOR, J., *post*, p. 485, KAVANAUGH, J., *post*, p. 486, and

JACKSON, J., *post*, p. 487, each filed concurring opinions. THOMAS, J., *post*, p. 488, and ALITO, J., *post*, p. 513, each filed dissenting opinions.

*Solicitor General Prelogar* argued the cause for petitioners. With her on the briefs were *Principal Deputy Assistant Attorney General Boynton, Deputy Solicitor General Fletcher, Nicole Frazer Reaves, Mark B. Stern*, and *Sean R. Janda.*

*Peter A. Patterson* argued the cause for respondents. With him on the brief for respondent VanDerStok et al. were *David H. Thompson, William V. Bergstrom, Cody J. Wisniewski, William E. Trachman, R. Brent Cooper*, and *Michael J. Sullivan. Charles R. Flores, Adam Kraut*, and *Josh Blackman* filed a brief for respondent Defense Distributed et al.*

*Briefs of *amici curiae* urging reversal were filed for the District of Columbia et al. by *Brian L. Schwalb*, Attorney General of the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Elissa R. Lowenthal*, Assistant Attorney General, by *Matthew J. Platkin*, Attorney General of New Jersey, *Jeremy Feigenbaum*, Solicitor General, and *Samuel L. Rubinstein*, Deputy Attorney General, by *Michelle A. Henry*, Attorney General of Pennsylvania, and *Lisa E. Eisenberg*, Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Kristin K. Mayes* of Arizona, *Rob Bonta* of California, *Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Kathleen Jennings* of Delaware, *Anne E. Lopez* of Hawaii, *Kwame Raoul* of Illinois, *Aaron M. Frey* of Maine, *Anthony G. Brown* of Maryland, *Andrea J. Campbell* of Massachusetts, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Aaron D. Ford* of Nevada, *Letitia James* of New York, *Joshua H. Stein* of North Carolina, *Edward E. Manibusan* of the Northern Mariana Islands, *Ellen F. Rosenblum* of Oregon, *Peter F. Neronha* of Rhode Island, *Charity R. Clark* of Vermont, *Robert W. Ferguson* of Washington, and *Joshua L. Kaul* of Wisconsin; for the American Medical Association et al. by *Michael J. Dell*; for the Constitutional Accountability Center by *Elizabeth B. Wydra* and *Brianne J. Gorod*; for the District Attorney for New York County et al. by *Steven C. Wu, Richard Dearing*, and *Claude S. Platton*; for Global Action on Gun Violence by *Timothy C. Hester* and *Jonathan E. Lowy*; for Gun Owners for Safety by *Robert M. Radick*; for Gun Violence Prevention Groups by *Kathleen R. Hartnett, Adam M. Katz*, and *Patrick J. Hayden*;

Page Proof Pending Publication

Opinion of the Court

JUSTICE GORSUCH delivered the opinion of the Court.

For decades, the Gun Control Act has regulated the sale of firearms.   This case poses the question whether the Act's

————

for the Local Government Legal Center et al. by *John J. Korzen* and *Amanda Karras*; for the Major Cities Chiefs Association et al. by *Mary B. McCord*, *pro se*, *Rupa Bhattacharyya*, and *Kelsi Brown Corkran*; for Professors and Scholars of Linguistics and Law by *Mark C. Fleming*; for Queens County District Attorney's Office by *John M. Castellano*; for Frank Blackwell et al. by *Lee R. Crain*, *Scott Edelman*, and *Katherine M. Marquart*; and for 20 Major Cities et al. by *Lee S. Richards* and *Arthur S. Greenspan*.

Briefs of *amici curiae* urging affirmance were filed for the State of West Virginia et al. by *Patrick Morrisey*, Attorney General of West Virginia, and *Michael R. Williams*, Solicitor General, by *Austin Knudsen*, Attorney General of Montana, *Christian B. Corrigan*, Solicitor General, and *Peter M. Torstensen, Jr.*, Deputy Solicitor General, and by the Attorneys General for their respective States as follows: *Steve Marshall* of Alabama, *Treg Taylor* of Alaska, *Tim Griffin* of Arkansas, *Ashley Moody* of Florida, *Chris Carr* of Georgia, *Raúl R. Labrador* of Idaho, *Theodore E. Rokita* of Indiana, *Brenna Bird* of Iowa, *Kris Kobach* of Kansas, *Russell Coleman* of Kentucky, *Liz Murrill* of Louisiana, *Lynn Fitch* of Mississippi, *Andrew Bailey* of Missouri, *Michael T. Hilgers* of Nebraska, *John Formella* of New Hampshire, *Drew Wrigley* of North Dakota, *Dave Yost* of Ohio, *Gentner Drummond* of Oklahoma, *Alan Wilson* of South Carolina, *Marty Jackley* of South Dakota, *Jonathan Skrmetti* of Tennessee, *Ken Paxton* of Texas, *Sean Reyes* of Utah, *Jason Miyares* of Virginia, and *Bridget Hill* of Wyoming; for the California Gun Rights Foundation by *Stephen M. Duvernay*; for the Citizens Committee for the Right to Keep and Bear Arms et al. by *Dan M. Peterson* and *C. D. Michel*; for the Firearms Regulatory Accountability Coalition et al. by *Stephen J. Obermeier*, *Jeremy J. Broggi*, and *Michael D. Faucette*; for the Foundation for Moral Law by *John A. Eidsmoe*; for Gun Owners of America, Inc., et al. by *John I. Harris III*; for the National Association for Gun Rights et al. by *David A. Warrington* and *Gary M. Lawkowski*; for the National Association of Sporting Goods Wholesalers by *Paul D. Clement*, *Erin E. Murphy*, *Matthew D. Rowen*, and *Kevin Wynosky*; for the National Rifle Association of America by *Joseph G. S. Greenlee* and *Erin M. Erhardt*; for the National Shooting Sports Foundation, Inc., by *H. Christopher Bartolomucci*, *Kenneth A. Klukowski*, *Stephen P. Halbrook*, and *Lawrence G. Keane*; and for Rick Vasquez et al. by *Bradley A. Benbrook*.

longstanding mandates also apply to those who make and sell a new product—"weapon parts kits."

## I

## A

Shortly after the assassinations of Senator Robert F. Kennedy and Dr. Martin Luther King, Jr. stunned the Nation, Congress adopted the Gun Control Act of 1968 (GCA). Pub. L. 90–618, 82 Stat. 1213. Existing gun control measures, Congress found, allowed criminals to acquire largely untraceable guns too easily. See 82 Stat. 225. Often, for example, criminals could evade state laws regulating in-person sales simply by purchasing guns through the mail. *Ibid.* In response, Congress adopted a number of new mandates. As a result, many of those now engaged in importing, manufacturing, or dealing in firearms must obtain federal licenses, keep records of their sales, and conduct background checks before transferring firearms to private buyers. 18 U. S. C. §§ 922(t), 923(a), (g)(1)(A). The Act also requires importers and manufacturers to mark their firearms with serial numbers. § 923(i).

These mandates serve at least two ends. The background-check requirement seeks to keep "guns out of the hands of criminals." *Abramski* v. *United States*, 573 U. S. 169, 180 (2014). The licensing, recordkeeping, and serialization requirements, meanwhile, aim "to assist law enforcement authorities in investigating serious crimes," *ibid.*, by permitting them "to determine where, by whom, or when" a firearm was manufactured and to whom it was "sold or otherwise transferred." 87 Fed. Reg. 24652 (2022). Today, thousands of law-enforcement agencies nationwide depend on the Act's tracing system to link firearms involved in crimes to their owners. *Id.*, at 24659.

The GCA's mandates apply to "firearm[s]." See §§ 922(t), 923(a), (i). And the law defines that key term broadly. Under § 921(a)(3), a "firearm" includes "(A) any weapon (in-

cluding a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." Thanks to this generous definition, the GCA has long been understood to reach everything from run-of-the-mill rifles to novelty umbrella guns. See AFT, Novelty Guns (June 5, 2015), https://www.atf.gov/firearms/photo-gallery-0.

Recent years, however, have witnessed profound changes in how guns are made and sold. When Congress adopted the GCA in 1968, "the milling equipment, materials needed, and designs were far too expensive for individuals to make firearms practically or reliably on their own." 87 Fed. Reg. 24688. With the introduction of new technologies like 3D printing and reinforced polymers, that is no longer true. Today, companies are able to make and sell weapon parts kits that individuals can assemble into functional firearms in their own homes. *Ibid.*

These kits vary widely both in how complete they come and in how much work is required to finish them. At one end of the spectrum, a kit may lack essential parts and "requir[e] substantial effort, specialized expertise, uncommon equipment, and a significant amount of time" before anyone can fire a shot. Brief for Former Acting Chief of ATF Firearms Technology Branch et al. as *Amici Curiae* 35. At the other end, some kits "contain all components necessary" for "a complete pistol" and can be completed in perhaps half an hour using commonly available tools. App. to Pet. for Cert. 236a.

Sales of these kits have grown "exponential[ly]." Brief for Petitioners 2. Home hobbyists enjoy assembling them. *VanDerStock* v. *Garland*, 86 F. 4th 179, 185 (CA5 2023). But criminals also find them attractive. *Id.*, at 195. That is largely due to how the kits are sold. Some manufacturers and dealers take the position that weapon parts kits do not

qualify as "firearms" subject to the GCA.    As a result, they say, they are free to sell their products without obtaining a federal license, conducting background checks, maintaining sales records, or marking components with serial numbers. 87 Fed. Reg. 24652.

The upshot?  "[P]olice departments around the Nation" have "confronted an explosion of crimes" involving these "ghost guns."   Brief for Petitioners 8.   In 2017, law-enforcement agencies submitted about 1,600 ghost guns to the federal government for tracing.   App. to Pet. for Cert. 194a.   By 2021, that number jumped to more than 19,000. *Ibid.*   Efforts to trace the ownership of these weapons, the government represents, have proven "almost entirely futile." Brief for Petitioners 8.

B

In 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives adopted a new rule designed to combat the proliferation of ghost guns.   See 87 Fed. Reg. 24652.   In doing so, the agency invoked authority Congress granted it to prescribe "rules and regulations as are necessary to carry out" the GCA.   18 U. S. C. § 926(a).   Two provisions in the agency's new rule are of special relevance here.

The first addresses weapon parts kits directly.   Recall that § 921(a)(3) extends the GCA's mandates to "firearms," a term subsection (A) defines as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." In its new rule, ATF interpreted this language to embrace weapon parts kits "that [are] designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive."   27 CFR § 478.11 (2023) (defining "firearm").   Those who make or sell kits that satisfy this test, ATF said, must comply with the GCA by securing federal licenses, conducting background checks, keeping sales records, and marking their products with serial numbers.   To decide whether a kit "may readily be converted" into a working gun, ATF added, it will con-

sider several factors, including the time, ease, expertise, and equipment required to complete a weapon, as well as the availability of other necessary parts. *Ibid.* (defining "readily").

The second relevant aspect of the agency's new rule concerns a key building block of almost any firearm: its frame or receiver. Under subsection (B) of § 921(a)(3), "the frame or receiver of any such weapon" covered by subsection (A) is itself treated as a "firearm." Effectively, that means a frame or receiver is, even when sold separately, subject to the Act's requirements. Presumably, Congress singled out these components for special treatment because of the special role they play in constructing firearms. As the government put it in 1968, a frame or receiver is "[t]hat part . . . which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 33 Fed. Reg. 18558; accord, 43 Fed. Reg. 13537 (1978) (formerly codified at 27 CFR § 478.11 (2020)).

In its 2022 rule, ATF sought to expand this definition. Now, the agency said, a "frame or receiver" subject to subsection (B) of § 921(a)(3), should be understood to encompass as well "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 CFR § 478.12(c) (defining "frame or receiver"). Still, ATF stressed, the Act and its new rule have their limits. They do not apply until an object has "reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon." *Ibid.* So, for example, "a forging, casting, printing, extrusion, unmachined body, or similar article" does not count. *Ibid.*[1]

---

[1] Besides these changes, ATF's new rule included a number of others. For instance, where the agency's old regulations defined frames and receivers as those parts housing *all* of a firearm's key components, 43 Fed. Reg. 13537, ATF's new rule redefined those terms to include parts housing

C

Before ATF's new rule took effect and ATF could begin efforts to enforce its new rule, various gun manufacturers, at-home gunsmiths, and others filed what they described as a "facial" challenge under the Administrative Procedure Act (APA). See, *e. g.*, BlackHawk Mfg. Complaint in No. 22–619 (ND Tex., Oct. 20, 2022), ECF Doc. 99, p. 25. They argued that the GCA cannot be fairly read to reach weapon parts kits or unfinished frames or receivers. As a result, the plaintiffs contended, ATF's regulations in § 478.11 and § 478.12(c) purporting to extend the GCA's mandates to these products could not be enforced against anyone and had to be "set aside" as impermissibly issued "in excess of statutory . . . authority." 5 U. S. C. § 706.

At summary judgment, the district court agreed with the plaintiffs and vacated the agency's new rule. *VanDerStok* v. *Garland*, 680 F. Supp. 3d 741, 766 (ND Tex. 2023). On appeal, the Fifth Circuit largely affirmed. The court acknowledged that subsection (A) of § 921(a)(3) authorizes ATF to regulate "weapons" that "may readily be converted to expel a projectile by the action of an explosive." But, the court reasoned, that language does not reach weapon parts kits. Nor does it matter how complete a kit may come or how easily it may be assembled. As a categorical matter, the court held, the Act reaches none of them. 86 F. 4th, at 195. The Fifth Circuit offered a similar assessment when it came to unfinished frames and receivers. Subsection (B) of § 921(a)(3) permits the agency to regulate "the frame or receiver of any such weapon" covered by subsection (A). But, the court held, those terms do not speak to, and thus do not allow the agency to regulate, unfinished frames and receivers, no matter how close to completion they may be. *Id.*, at 190. For these reasons, the court of appeals concluded, the

only *some* key components, see 27 CFR §§ 478.12(a)(1), (a)(2). But because the plaintiffs did not challenge that amendment or others in proceedings below, see Brief for Respondent VanDerStok et al. 31, n. 4, we have no occasion to pass upon them, see *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

provisions in ATF's new rule addressing weapon parts kits, §478.11, and unfinished frames and receivers, §478.12(c), were facially inconsistent with GCA and thus had to be "set aside" consistent with the APA, 86 F. 4th, at 195.

The government sought review in this Court. Our intervention was necessary, the government insisted, because the court of appeals had "adopted an interpretation of the Act that would effectively nullify its central provisions" and leave criminals today nearly as free to obtain "untraceable firearms" as they were before the Act's adoption in 1968. Pet. for Cert. 28. We agreed to hear the case. 601 U. S. 1161 (2024).

## II

As presented to us, this case does not ask us to resolve whether ATF's new regulations in §478.11 and §478.12 may be lawfully applied to particular weapon parts kits or unfinished frames or receivers. Instead, the plaintiffs have pursued what the lower courts called a "facial" pre-enforcement challenge to the agency's authority to regulate *any* weapon parts kits or unfinished frames or receivers. 680 F. Supp. 3d, at 766; 86 F. 4th, at 186. In a challenge like that, the government represents, "the possibility that [ATF's regulation] 'may be invalid as applied' in some cases 'does not mean that the regulation is facially invalid.' Instead, [the plaintiffs'] burden is to show that the Rule itself is inconsistent with the statute on its face." Brief for Petitioners 27–28 (quoting *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S. 183, 188 (1991); citation omitted (addressing a facial challenge under the Immigration and Nationality Act)). Nowhere in either of their briefs before us do the plaintiffs dispute that assessment. Accordingly, we take it as given for our purposes here.[2]

---

[2] The dissents raise a number of questions about what test courts should apply when a party contends that an agency has acted in excess of its statutory authority in a pre-enforcement challenge under the APA. *Post*, at 494–496 (opinion of THOMAS, J.); *post*, at 515–516 (opinion of ALITO, J.). But the theories the dissents proceed to advance were not pressed or passed upon below, nor did the parties make them before this Court. Cf. *post*, at 515

In doing so, we turn first to the question whether § 478.11's provisions addressing weapon parts kits are inconsistent on their face with the GCA. The answer turns on subsection (A) of § 921(a)(3). There, remember, the GCA authorizes ATF to regulate "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Inhering in this language are two requirements. First, a "weapon" must be present. Second, that "weapon" must meet one of three criteria: It must be able to expel a projectile by the action of an explosive, designed to do so, or susceptible of ready conversion to operate that way. As the Fifth Circuit saw it, § 478.11's provisions addressing weapon parts kits are facially invalid because no weapon parts kit can ever satisfy the statute's two requirements. We disagree because, to our eyes, at least some kits will satisfy both.

A

To appreciate why, it helps to work with an example. Take a weapon parts kit featured prominently in the record before us: Polymer80's "Buy Build Shoot" kit. It comes with "all of the necessary components to build" a Glock-variant semiautomatic pistol. App. to Pet. for Cert. 219a. And it is so easy to assemble that, in an ATF test, an individual who had never before encountered the kit was able to produce a gun from it in 21 minutes using only "common" tools and instructions found in publicly available YouTube videos. *Id.*, at 220a. The first picture below shows the kit; the second depicts the gun the kit yields.

_____

(opinion of ALITO, J.) (suggesting that the Court ask for supplemental briefing). In these circumstances, we believe the better course is to leave further analysis of the proper test for another day and address the parties' dispute as they have chosen to frame it. Nor, on remand, may the parties seek to inject arguments about the proper test that they did not pursue here. See *Ohio* v. *Environmental Protection Agency*, 603 U. S. 279, 299 (2024) (forfeiture); *Sibbald* v. *United States*, 12 Pet. 488, 492 (1838) (law of the case); contra, *post*, at 496 (THOMAS, J., dissenting).

Opinion of the Court



*Id.,* at 232a, 238a.

Now, assess whether the "Buy Build Shoot" kit meets subsection (A)'s two tests, and start with the question whether Polymer80's offering qualifies as a "weapon." When Congress adopted the GCA in 1968, that term meant what it means today: "an instrument of offensive or defensive combat [such] as a club, sword, gun, or grenade." Webster's Third New International Dictionary 2589 (def. 1) (1966); accord, 1 Concise Oxford Dictionary of Current English 1476 (def. 1) (5th ed. 1964). As a result, ATF's authority under subsection (A) extends only to instruments of combat, not to other things like industrial tools or toy guns that may "expel a projectile by the action of an explosive." It is a feature of the statute the agency itself has long acknowledged. See 87 Fed. Reg. 24684.

Plainly, the finished "Buy Build Shoot" kit is an instrument of combat. No one would confuse the semiautomatic pistol pictured above with a tool or a toy. Of course, as sold, the kit requires some assembly. But a number of considerations persuade us that, even as sold, the "Buy Build Shoot" kit qualifies as a "weapon."

Consider, first, a feature of ordinary language. The term "weapon" is an artifact noun—a word for a thing created by humans. Artifact nouns are typically characterized by an intended function," rather than by some "ineffable 'natural essence.'" S. Grimm & B. Levin, Artifact Nouns: Reference and Countability, in 2 Proceedings of the Forty-Seventh Annual Meeting of the North East Linguistic Society (NELS 47) 55 (2017).[3] Reflecting as much, everyday speakers sometimes use artifact nouns to refer to unfinished objects—at least when their intended function is clear. An author might invite your opinion on her latest *novel*, even if she sends you

---

[3] Accord, Brief for Professors and Scholars of Linguistics and Law as *Amici Curiae* 6–9; J. Pustejovsky, The Generative Lexicon 97 (1995); J. Coleman & O. Simchen, "Law," 9 Legal Theory 1, 20 (2003); T. Parsons, The Progressive in English, 12 Linguistics in Philosophy 213, 225–226 (1989).

an unfinished manuscript. A friend might speak of the *table* he just bought at IKEA, even though hours of assembly remain ahead of him. In both cases, the artifact noun fits because the intended function of the unfinished object is obvious to speaker and listener alike.

The term *weapon* can work this way, too. Imagine a rifle disassembled for storage, transport, or cleaning. It may take time to render the rifle useful for combat, but its intended function is clear. And, as a matter of every day speech, that rifle *is* a weapon, whether disassembled or combat ready. In the same way and for the same reason, an ordinary speaker might well describe the "Buy Build Shoot" kit as a "weapon." Yes, perhaps a half hour of work is required before anyone can fire a shot. But even as sold, the kit comes with all necessary components, and its intended function as instrument of combat is obvious. Really, the kit's name says it all: "Buy Build *Shoot.*"

Next, consider what the statute itself has to say about the term "weapon." Subsection (A) tells us that the term "includ[es] a starter gun." §921(a)(3)(A). A starter gun, of course, normally fires blanks, not bullets, and is usually found at sporting events, not in combat. See *United States* v. *Hall*, 396 F. 2d 841, 842, n. 2 (CA4 1968). To be sure, a starter gun can be converted to live fire using a power tool commonly available at hardware stores. See *United States* v. *Mullins*, 446 F. 3d 750, 755 (CA8 2006). For someone with no "specialized knowledge," the process can take "less than an hour." *Ibid.* But, notably, the statute teaches that a starter gun is a "weapon" *before* anyone invests that work. All of which indicates that Congress used that term, as an ordinary speaker might, to embrace some unfinished instruments of combat like Polymer80's product.

Finally, notice another feature of the statute. If Congress had wanted to regulate only operable firearms, it could have simply addressed "weapons" that can "expel a projectile by the action of an explosive." But Congress didn't stop there.

Instead, Congress explained that a "weapon" also qualifies for regulation if it is either "designed" to accomplish that function or capable of being "readily . . . converted" to do so. § 921(a)(3)(A). Those latter provisions necessarily contemplate that some things short of fully operable firearms will qualify as "weapons." And if that is true, it is difficult to see how the easy-to-assemble "Buy Build Shoot" kit might not be among them.

Of course, to implicate the Act, not only must a "weapon" be present. That weapon must meet one of the just-recounted conditions. At a minimum, that means a weapon must be capable of being "readily . . . converted to expel a projectile by the action of an explosive." *Ibid.* As we see it, the "Buy Build Shoot" kit satisfies that test, too.

Begin with what we can glean about the "ready-conversion" standard from the statute. We know that Congress's direction that a starter gun is a "weapon" would be pointless unless a starter gun satisfies all subsection (A)'s terms. For the statute to make sense, then, a starter gun must be able to fire bullets, designed to do so, or capable of ready conversion to operate that way. Generally, however, a starter gun meets neither of the first two conditions, for its barrel is deliberately blocked. See *United States* v. *16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F. 2d 463, 465 (CA2 1971). That leaves only one serious possibility: It must be that a starter gun "can readily be converted to expel projectiles by the action of an explosive."

That turns out to tell us all we need to know about the statute's "ready conversion" test. As we have seen, a person without any specialized knowledge can convert a starter gun into a working firearm using everyday tools in less than an hour. *Mullins*, 446 F. 3d, at 755. And measured against that yardstick, the "Buy Build Shoot" kit can be "readily converted" into a firearm too, for it requires no more time, effort, expertise, or specialized tools to complete. App. to Pet.

for Cert. 220a. If the one meets the statutory test, so must the other.

Admittedly, our reasoning here has its limits. Just because some kits, like Polymer80's, qualify as "weapons" that "can readily be converted" into working firearms does not mean all do. Think of the problem of the heap: Start with a heap of sand and begin removing grains; at some point, a heap no longer exists. That problem attends many artifact nouns. Even when used to capture unfinished products, artifact nouns generally reach only so far. It would be extravagant to speak of a *novel* when the author has dashed off only a few lines. Few would call a pile of unfinished logs a *table*. Subsection (A) may present a similar problem. Weapon parts kits vary widely. See Part I–A, *supra*. Not all come as complete as the "Buy Build Shoot" kit. Some, too, may require more time, expertise, or specialized tools to finish. And at some point a kit may be so incomplete or cumbersome to assemble that it can no longer fairly be described as a "weapon" capable of "read[y] . . . conver[sion]" into a working firearm. § 921(a)(3)(A).

While we recognize the problem, this case does not require us to untangle exactly how far subsection (A) reaches. The plaintiffs argue only that § 478.11's provision addressing weapon parts kits is facially inconsistent with the statute. The Fifth Circuit adopted the same view after coming to the unqualified conclusion that weapon parts kits can never satisfy the statute's two tests. To resolve this case, it is enough to say those assessments are mistaken. Because at least some weapon parts kits satisfy both of subsection (A)'s tests, § 478.11 is not facially invalid. Future cases may present other and more difficult questions about ATF's regulations. But we take cases as they come and today resolve only the question posed to us.

B

The plaintiffs dispute little of what we have said. They admit that artifact nouns sometimes capture unfinished arti-

cles. Tr. of Oral Arg. 76–77. They recognize that starter guns qualify as "weapons" even though they require work before they operate as functional firearms. Brief for Respondent VanDerStok et al. 34. The plaintiffs concede, too, that disassembled rifles and guns are "weapons" that can be "readily . . . converted" to live fire because they have "all the parts necessary" for an ordinary person "to put together a functioning firearm" in short order. *Id.*, at 37. Really, the plaintiffs fail only to take the next step and acknowledge that the same might be said of some weapon parts kits.

Given all that, what do the plaintiffs have to say in support of the Fifth Circuit's conclusion that subsection (A) reaches *no* weapon parts kits? Perhaps their best argument centers on the fact that other statutes address collections of parts while this one does not. As the plaintiffs observe, Congress has elsewhere defined a "destructive device" to embrace "any combination of parts . . . from which a destructive device may be readily assembled." §921(4)(C). Similarly, Congress has specified that the terms "firearm silencer" and "firearm muffler" encompass "any part" or "combination of parts" used to "assembl[e] or fabricat[e]" those items. §921(a)(25); see also Federal Firearms Act of 1938, 52 Stat. 1250 (defining "firearm" to include "any part or parts of such weapon"). Subsection (A), meanwhile, employs none of those terms. And because Congress has spoken elsewhere to collections of firearm parts, the plaintiffs insist, we should infer this statute does not address parts or kits containing any combinations of them.

The plaintiffs' conclusion, however, does not follow from their premise. We do not doubt that subsection (A) sweeps more narrowly than some other statutes. No one thinks it reaches every piece or part that can be used to produce a firearm. Recognizing as much, ATF itself acknowledges that subsection (A) does not allow it to regulate "standalone triggers, barrels, stocks, or magazines." Brief for Petition-

ers 24. Nor, the agency admits, does the statute authorize it to regulate "weapon parts writ large," without regard to how complete they come or how difficult they are to assemble. *Ibid.* But the fact that subsection (A) doesn't go as far as some other statutes does not tell us how far it does go. Let alone prove that subsection (A) fails, as a categorical matter, to reach any weapon parts kits.

Faced with that problem, the plaintiffs, joined now by the dissent, try another tack. They object that weapon parts kits cannot be "weapons" under subsection (A) because they lack functional frames or receivers. See Brief for Respondent VanDerStok et al. 35; *post*, at 507–508 (opinion of THOMAS, J.) (advancing a similar argument). That conclusion rests on two premises: (1) that a "weapon" must have a fully "functional" frame or receiver, and (2) that no "weapon-parts kit" includes such a part. *Post*, at 507–508 (opinion of THOMAS, J.). But neither premise is sound. For one, the statute nowhere says that a "weapon" must have a fully functional frame or receiver—nor is it obvious how we might derive such a rule from its terms. In fact, as we have seen, subsection (A) reaches any "weapon" that may "readily be converted" to live fire. § 921(a)(3)(A). And a gun that is fully operable, save for a frame missing a single and easily-added screw, would surely fit that description. See Part II–A, *supra*. For another, even if the statute *did* require a "weapon" to have a fully functional frame or receiver, some weapon parts kits may fit that description. Imagine a kit identical to Polymer80's in all respects, except that it has a complete frame. Even the plaintiffs would have to admit that such a kit would count as a "weapon" under subsection (A).

Failing all else, the dissent suggests that other criminal statutes addressing "firearm[s]" prove that weapon parts kits cannot fall within the statutory definition of that term. *Post*, at 508–509. So, for example, the dissent observes that Congress has penalized the use of "firearm[s]" during and in rela-

tion to a "crime of violence," § 924(c), required "firearm[s]" to be "unloaded" during transportation, § 926A, and permitted law-enforcement officers to carry "concealed firearm[s]," § 926B. And, the dissent continues, it is "hard to imagine" how any of those provisions might apply to weapon parts kits. *Post*, at 509. As a result, the dissent insists, we should prefer a reading that limits the term "firearm" to completely operable guns. *Ibid.*

This argument suffers at least two problems as well. First, what the dissent finds hard to imagine turns out to be anything but, for various criminal laws addressing firearms can apply to weapon parts kits. Just consider some of the laws we have already encountered that require those who import, manufacturer, or deal in "firearms" to obtain federal licenses, keep records of their sales, and conduct background checks. §§ 922(t), 923(a), (g)(1)(A). Plainly, those criminal laws can be applied sensibly to weapon parts kits. Or, to take one of the dissent's own examples, a weapon parts kit might be "possesse[d]" "in furtherance of" a "crime of violence" in violation of § 924(c)(1) when an individual accused of attempted robbery purchases the kit for assembly and use in an upcoming heist. See *Stokeling* v. *United States*, 586 U. S. 73 (2019) (holding that a state robbery statute qualifies as a crime of violence).

Second, the dissent's complaint is hardly resolved by adopting its view of the statute. The dissent must acknowledge, for example, that standalone "frame[s] or receiver[s]" and "silencer[s]" qualify as "firearms," for the statute tells us so expressly. § 921(a)(3). Yet, only rarely would someone use a standalone "frame or receiver" during a "crime of violence," § 924(c), and it may be impossible to "unloa[d]" a "silencer" during "transportation," § 926A. So whether one adopts our interpretation or the dissent's, not every "firearm" will be capable of implicating every criminal law discussing firearms. It's a fact that, if it proves anything,

proves only that Congress's definition of "firearm" is a capacious one indeed.[4]

## III

That leaves the question whether ATF's new regulation addressing unfinished frames and receivers, §478.12(c), is facially inconsistent with the GCA. The answer here turns on subsection (B) of §921(a)(3). That provision of the statute permits the agency to regulate the "frame or receiver of any such weapon." As the Fifth Circuit saw it, this language reaches only finished frames or receivers. So those who make, import, or sell partially complete frames or receivers may do so free from the GCA's mandates, no matter how quickly and easily their products can be finished, and ATF is powerless to hold otherwise. Once again, the plaintiffs ask us to endorse that categorical conclusion. And, once again, we find we cannot. The GCA reaches, and permits ATF to regulate, at least some "partially complete" frames or receivers. §478.12(c).

_____

[4] Separately, the dissent seems to dismiss the possibility that Congress might use an artifact noun in a way that encompasses incomplete objects. *Post*, at 502–503 (opinion of THOMAS, J.). But the dissent does not dispute that our task here, as ever, is to interpret the words Congress enacted "consistent with their ordinary meaning." *Wisconsin Central Ltd.* v. *United States*, 585 U. S. 274, 278 (2018). Nor does the dissent dispute that ordinary speakers sometimes use artifact nouns to reach incomplete objects. In fact, the dissent ultimately concedes that even Congress "might sometimes" do the same. *Post*, at 503–504, n. 7 (opinion of THOMAS, J.). At bottom, then, the dissent's only point appears to be that "traditional methods of statutory interpretation" should guide us in assessing whether Congress meant for a particular artifact noun to reach incomplete objects. *Ibid.* On that, we agree. And here, as we have seen, one of the most traditional tools for discerning statutory meaning—contextual clues found in the pertinent statute itself—suggest that Congress used the term "weapon" to reach at least some unfinished instruments of combat. In saying as much, we do not suggest that Congress always uses artifact nouns to reach incomplete objects—only that we are persuaded it did so here.

A

Working with another example drawn from the record helps illustrate why this is so. The first photograph below depicts the complete frame of a Glock-variant firearm, the second a partially complete frame that Polymer80 sells.





App. 259, 263.

The main differences between the completed frame and Polymer80's product are the plastic tabs circled in red. Brief for Petitioners 34–35. The record suggests that those tabs "are easily removable by a person with novice skill,

using common tools . . . , within minutes." App. 262. Once the tabs are gone and a "few holes are drilled for the pins that hold [other] parts in place—again, a task that anyone can complete in minutes—the Polymer80 product is a fully functional frame." Brief for Petitioners 35.

A number of reasons persuade us that this qualifies as a "frame" for purposes of subsection (B). First, like the word "weapon" in subsection (A), the terms "frame" and "receiver" in subsection (B) are artifact nouns. And, as artifact nouns, they may sometimes describe not-yet-complete objects. Recall the author who refers to her manuscript as a *novel*, or your friend who calls his IKEA kit a *table*. In much the same way, an ordinary speaker might well call Polymer80's product a firearm "frame," even though a little work is required to complete it. Just look again at the second photo. What else would you call it?

Next, consider how the GCA uses the words "frame" and "receiver" elsewhere. Section 923(i) spells out the Act's serialization mandate. It requires those who make or sell "firearms" to identify their products "by means of a serial number engraved or cast on the receiver or frame." Though this directive may seem simple enough, it is complicated by the fact that the statutory definition of "firearm" includes some incomplete "weapon[s]," "muffler[s]," "silencer[s]," and "destructive device[s]." § 921(a)(3). Sometimes, those items lack a finished or prototypical firearm frame or receiver. Yet, all the same, § 923(i) treats them as "firearms" that must have a serial number engraved or cast on their "frame[s]" or "receiver[s]." And if the words "frame" and "receiver" encompass some unfinished and unconventional frames or receivers in § 923(i), it is hard to see how those same words might bear a more restrictive meaning when they appear just a few sections away in § 921(a)(3)(B). See *Azar* v. *Allina Health Services*, 587 U. S. 566, 574 (2019) (recounting the usual rule that a word carries the same meaning throughout a single statute); *post*, at 505 (THOMAS,

J., dissenting) (admitting that a contrary interpretation requires giving the terms "frame" and "receiver" different meanings in different places).

Here, too, examples help. Imagine a handgun that is otherwise ready to shoot, but contains Polymer80's incomplete frame. An ordinary person, using ordinary tools, can finish the frame in minutes. App. 262. For reasons explored in Part II, *supra*, that gun is a weapon capable of ready conversion into a working firearm under subsection (A). So § 923(i) requires the gun's "frame"—the very item that isn't fully finished—to bear a serial number. Along similar lines, consider silencers. They lack traditional frames, but § 923(i) requires manufacturers and importers to serialize them. To accommodate that instruction, ATF has long deemed the "outer tube . . . that provides housing or a structure for the primary internal component" to be a silencer's "frame or receiver." 27 CFR § 478.12(b); accord, § 478.92(a)(4)(ii) (supplying directions for "destructive devices"). In all these ways and more, § 923(i) uses the phrase "frame or receiver" to reach some unfinished and unconventional frames and receivers, making it only sensible to think the same phrase does the same work a few doors away in § 921(a)(3)(B).

The novelty of the plaintiffs' complete-items-only reading of subsection (B) supplies another strike against it. Without question, ATF's new rule seeks to regulate a greater variety of unfinished frames and receivers than the agency has in the past. But it is equally true that, for decades, the agency has consistently interpreted subsection (B) to reach some unfinished frames and receivers, including ones no more finished than Polymer80's product. See, *e. g.*, ATF, Are "80%" or "Unfinished" Receivers Illegal? (Apr. 6, 2020), https://www.atf.gov/firearms/qa/are-"80"-or-"unfinished"-receivers-illegal; App. 117–118 (2013 guidance); *id.*, at 5, 8, 10 (1990–1994 classification letters); *id.*, at 22 (deeming a frame with additional "material left on top" to be a "firearm"). And while "courts must exercise independent judgment in determining the

meaning of statutory provisions," the contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning. *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 394 (2024).[5]

Last but not least, the plaintiffs represent that they have no "quarrel" with ATF's "prior practice." Tr. of Oral Arg. 59. It is a concession that all but gives the game away. Of course, the plaintiffs think the agency's new rule reaches further than the statute can bear by seeking to regulate some products too far removed from finished frames or receivers. But, for our purposes, what matters is that even the plaintiffs do not really insist that subsection (B) reaches only finished frames and receivers.

Here, again, our reasoning has its limits. In saying that a product like Polymer80's qualifies as a "frame," we do not suggest that the GCA reaches, and ATF may regulate, any combination of parts susceptible of conversion into a frame or receiver with sufficient time, tools, and expertise. Like the term "weapon," the artifact nouns "frame" and "receiver" have their bounds. Some products may be so far from a finished frame or receiver that they cannot fairly be described using those terms. But this case requires us to explore none of that. The plaintiffs do not challenge ATF's new rule as applied to particular products. They argue only that § 478.12 is facially inconsistent with the GCA. And, here again, we have no trouble rejecting that unqualified view.

B

Resisting our conclusion on this score, the plaintiffs and dissent press three main replies.

---

[5] The dissent admits that ATF's prior practice was to "evaluat[e] the level of completion" when deciding whether an unfinished object was a "regulable frame or receiver." *Post*, at 492 (opinion of THOMAS, J.) (quoting App. 23). So even if the new rule looks at different evidence in making that same determination, *post*, at 499–500, it reflects the agency's consistent understanding that subsection (B) reaches some incomplete "frames or receivers."

First, they point to a linguistic difference between subsections (A) and (B). In subsection (A), Congress chose to regulate "weapons" that "can readily be converted" into operating firearms. Meanwhile, in subsection (B) Congress spoke only of "frames or receivers," not parts that "can readily be converted" into those things. And, as the plaintiffs see it, that omission counsels against reading subsection (B) to reach any unfinished frames or receivers. Brief for Respondent VanDerStok et al. 19; see also *post*, at 498–499 (THOMAS, J., dissenting) (making a similar point).

This argument fails to persuade us for a number of familiar reasons. For one, it does not account for the fact that ordinary speakers sometimes use unadorned artifact nouns like "weapon," "frame," or "receiver" to reach unfinished articles. Adopting the plaintiffs' argument would also require us to read the phrase "frame or receiver" in § 921(a)(3)(B) to embrace only finished products, even though § 923(i)'s use of the same phrase sweeps more broadly. To accept this argument, we would have to disregard as well the plaintiffs' concession that the terms "frame" and "receiver" in subsection (B) are properly understood, as they have been long understood, to reach some unfinished frames or receivers.

Even beyond all that, reading subsection (B) in light of subsection (A) does more to undermine than to advance the plaintiffs' cause. Subsection (B) speaks of the "frame or receiver *of any such weapon*." § 921(a)(3)(B) (emphasis added). That italicized phrase refers us back to weapons encompassed by subsection (A). And, as we have seen, the term "weapon" in subsection (A) encompasses some things that are not yet fit for effective use in combat, including starter guns and disassembled rifles, as well as certain weapon parts kits. Subsection (B) expressly incorporates that definition of "weapon." And, if anything, the fact that Congress used one artifact noun ("weapon") in subsection (B) to reach some unfinished articles suggests it used two other

artifact nouns ("frame" and "receiver") in the same way in the same provision.

Second, the plaintiffs and the dissent contend, our interpretation of subsection (B) could invite a serious unintended consequence under a separate statute, the National Firearms Act (NFA), ch. 757, 48 Stat. 1236. That law bans the possession of "machinegun[s]," a term Congress has defined to include the "frame or receiver" of "any such weapon." 26 U. S. C. §5845(b). Interpreting the GCA to reach some unfinished frames or receivers, the plaintiffs reason, might lead the government to attempt a similar reading of the NFA. And if the government takes that step, the plaintiffs suggest, it might next attempt to classify the receiver of an AR–15 rifle as a "machinegun" because it "is possible to convert" those receivers "to function as machinegun receivers." Brief for Respondent VanDerStok et al. 15; see also *post*, at 500 (THOMAS, J., dissenting). That result, the plaintiffs warn, could leave many Americans facing new and unforeseen criminal liability for possession of a "machinegun" simply because they own a "popular" and "commonly available" rifle. Brief for Respondent VanDerStok et al. 22 (quoting *Garland* v. *Cargill*, 602 U. S. 406, 430 (2024) (SOTOMAYOR, J., dissenting)); 87 Fed. Reg. 24652.

The plaintiffs' fears are misplaced. The government represents that AR–15 receivers do not "qualify as the receiver of a machinegun." Reply Brief 11–12. Nor, the government emphasizes, has ATF ever "suggested otherwise." *Ibid.* Much the same can be said of our reasoning today. As we have stressed, a statute's text and context are critical to determining whether (and to what extent) Congress used an artifact noun to reach unfinished objects. And, without doubt, the NFA and the GCA are different statutes passed at different times to address different problems using different language. Our analysis of the GCA thus does not begin to suggest that ATF possesses authority

to regulate AR–15 receivers as machineguns under the NFA.

Third, the plaintiffs criticize ATF's rule for permitting the agency to consider "jigs," "tools," and "instructions" when deciding whether an incomplete "frame or receiver" is close enough to the finished product to fall under subsection (B). Brief for Respondent VanDerStok et al. 25–26. The dissent echoes the complaint, offering a photo from the record depicting various tools and jigs. See *post*, at 501 (opinion of THOMAS, J.). But if this is a problem at all, it is one for another day. As litigated, this case does not call on us to address what weight, if any, ATF may lawfully give jigs, tools, and instructions when deciding whether a frame or receiver is present. This case requires us to answer only whether subsection (B) reaches some incomplete frames or receivers. Saying that it does is enough to resolve the dispute before us.

\*

The plaintiffs close by asking us to invoke the rule of lenity or the doctrine of constitutional avoidance to resolve in their favor any ambiguities about §921(a)(3). Brief for Respondent VanDerStok et al. 38; see also *post*, at 511–512 (THOMAS, J., dissenting). But neither lenity nor avoidance has any role to play where "text, context, and structure" decide the case. *Van Buren* v. *United States*, 593 U. S. 374, 393–394 (2021). And even if ambiguities at the outer boundaries of subsections (A) and (B) emerge in future disputes involving the application of those provisions to particular products, no room for doubt exists about the answer to the question the parties have posed to us. The GCA embraces, and thus permits ATF to regulate, some weapon parts kits and unfinished frames or receivers, including those we have discussed. Because the court of appeals held otherwise, its judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOTOMAYOR, concurring.

I join the Court's opinion in full. I write separately to address two points raised in the writings that follow. The first is a concern that ATF's rule might leave regulated entities in doubt about when and how to comply with the Gun Control Act. See *post*, at 486 (KAVANAUGH, J., concurring). That worry is unfounded.

For more than half a century, firearms dealers, manufacturers, and importers have complied with the Gun Control Act's requirements. They have marked their products with serial numbers, kept records of firearm sales, and conducted background checks for prospective buyers. See 18 U. S. C. §§ 922(t), 923(g)(1)(A), 923(i). These requirements are not new to the industry, and covered entities know they must maintain familiarity with the statute and accompanying regulations to run their businesses. In fact, the Act requires such entities to obtain federal licenses before selling, manufacturing, or importing any firearms in the first place. § 923(a).

What is new is that some manufacturers have sought to circumvent the Act's requirements by selling easy-to-assemble firearm kits and frames, which they claim fall outside the statute's scope. See 87 Fed. Reg. 24652, 24655, 24686 (2022). ATF's rule simply confirms what was already clear: The Gun Control Act does not tolerate such evasion. Its plain text covers firearm kits and unfinished frames or receivers designed for ready conversion, as the Court explains. So, for entities who seek to comply with the Act in good faith, ATF's rule should come as no surprise. Nor should it create any difficulty discerning how to abide by the law.

To the extent any manufacturer has doubts about whether a particular product qualifies as a covered firearm, moreover, it can eliminate uncertainty by seeking clarification from the agency. ATF encourages manufacturers to submit potentially covered products to the agency for classification decisions. See Brief for Petitioners 5 (citing Dept. of Jus-

tice, ATF, Office of Enforcement Programs & Servs., ATF National Firearms Act Handbook 41 (ATF E-Publication 5320.8 rev. Apr. 2009)); 27 CFR § 478.92(c) (2023). Manufacturers have long taken advantage of that process, see, *e. g.*, App. 8, 10–12, 21–22, 50–52, 53–54, and a failure to do so might suggest willfulness on their part.

The second point I address is the suggestion that the Act permits ATF to regulate only "all-but-assembled" weapon parts kits and frames "as close to completion as possible." *Post*, at 513 (ALITO, J., dissenting). The Court's opinion speaks for itself on that point and others. I encourage readers to go to the source, rather than rely on dissents, to understand what the Court holds. See *ante*, at 467, 471–472, 478, 480–482, 484. It is the Court's ruling, not the one set forth by the dissents, that binds the lower courts.

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion in full. I add this concurrence to briefly address *mens rea* issues with respect to ATF's 2022 rule.

Under ATF's rule, an individual or business acting in good faith might nonetheless have substantial difficulty determining when weapon parts kits or unfinished frames or receivers qualify as firearms—and thereby become subject to the Gun Control Act's licensing, recordkeeping, serialization, and background-check requirements. Some weapon parts kits and unfinished frames or receivers may qualify as firearms, and others may not. See *ante*, at 473, 481. The line is not entirely clear. Despite the vagueness of the line, the penalties for violations are significant and can include fines and imprisonment. See 18 U. S. C. § 924.

But importantly, under the Gun Control Act, someone can be penalized for violating the licensing, recordkeeping, or serialization requirements only if he does so "willfully." § 924(a)(1)(D). To prove "willfulness," the Government

JACKSON, J., concurring

must demonstrate that an individual knew that his conduct was unlawful, not merely that he knew the facts that made his conduct unlawful. *Bryan* v. *United States*, 524 U. S. 184, 191–196 (1998). Therefore, with respect to ATF's rule, the "willfulness" requirement should help prevent the Government from unfairly penalizing an individual who is not aware that his conduct violates the law.

As to background-check violations, by contrast, the statute penalizes violations committed "knowingly." §§ 922(t), 924(a)(5). The "knowingly" *mens rea* requires "proof of knowledge of the facts that constitute the offense." *Id.*, at 193. Unlike the "willfully" *mens rea*, it generally does not require knowledge that the conduct was unlawful. See *id.*, at 192–193. That lesser "knowingly" *mens rea* requirement could therefore create concerns about fair notice, at least in certain cases. See *Wooden* v. *United States*, 595 U. S. 360, 379 (2022) (KAVANAUGH, J., concurring).

That said, at oral argument, the Government represented that it would "likely" decline to "charge someone" for a background-check violation in the "kind of situation" where the individual was not aware that he was violating the law. Tr. of Oral Arg. 46–47. As the Government seemed to recognize, if the Government were to charge a background-check violation against an individual who was unaware that he was violating the law, that defendant might have a due process argument based on lack of fair notice. I expect that the Government will seek to avoid that potential fair-notice problem by adhering to its oral-argument representation that it would likely decline to bring charges in those circumstances.

JUSTICE JACKSON, concurring.

To me, the nature of the claim at issue in this case makes its resolution quite straightforward. No one disputes that Congress delegated rulemaking authority to the Executive

Branch through the Gun Control Act of 1968, as amended. See 18 U. S. C. § 926(a). Nor is it contested that the Bureau of Alcohol, Tobacco, Firearms and Explosives, an Executive Branch agency, relied on that delegated authority to promulgate the challenged rule. Before us, respondents claim only that portions of the resulting rule exceed the agency's statutory authority. See 5 U. S. C. § 706(2)(C). Our judicial charge, then, is to evaluate the scope of the Gun Control Act's delegation of authority to the agency, and to determine whether the agency's actions transgressed those bounds. That limited exercise should be dispositive.

Proper excess-of-authority review must focus on actual statutory boundaries, not on whether the agency's discretionary choices overlap precisely with what we, as unelected judges, would have done if we were standing in the agency's shoes. And where, as here, the statute's boundaries do not foreclose the agency's action, the excess-of-authority claim should meet its end. I concur because I read the Court's opinion to be consistent with this view.

JUSTICE THOMAS, dissenting.

The Government asked this Court just last Term to " 'rewrite' " statutory text so that it could regulate semiautomatic weapons as machineguns. *Garland* v. *Cargill*, 602 U. S. 406, 428 (2024). We declined to do so. The Government now asks us to rewrite statutory text so that it can regulate weapon-parts kits. This time, the Court obliges. I would not. The statutory terms "frame" and "receiver" do not cover the unfinished frames and receivers contained in weapon-parts kits, and weapon-parts kits themselves do not meet the statutory definition of "firearm." That should end the case. The majority instead blesses the Government's overreach based on a series of errors regarding both the standard of review and the interpretation of the statute. I respectfully dissent.

## I

## A

In 1934, Congress enacted the National Firearms Act (NFA), the first federal statute to regulate the firearms industry. Congress enacted this statute to "provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof." Ch. 757, 48 Stat. 1236.

The NFA defined "firearm" narrowly. The term covered only certain short-barreled shotguns or rifles, machineguns, and silencers or mufflers. *Ibid.* Congress broadened that definition four years later through the Federal Firearms Act of 1938 (FFA), defining "firearm" to include "any weapon . . . designed to expel a projectile or projectiles by the action of an explosive . . . *or any part or parts* of such weapon." 52 Stat. 1250 (emphasis added). With minor amendments not relevant here, that definition endured for about 30 years.

In 1968, Congress replaced the FFA with the Gun Control Act (GCA). The GCA, which remains in effect today, is the principal federal law regulating the commercial firearm market. See Pub. L. 90–618, 82 Stat. 1213. It requires manufacturers and dealers of firearms to have a federal license, and, in most cases, to conduct background checks, maintain records, and apply serial numbers to their firearms. See 18 U. S. C. §§ 922(t) and 923(a), (g)(1)(A), and (i). The GCA also imposes criminal sanctions for a variety of well-known firearms offenses. See, *e. g.*, § 922(g) (prohibiting large swaths of people from shipping, transporting, possessing, or receiving a "firearm"); § 924(c) (providing a sentencing enhancement for persons who carry a "firearm" during crimes of violence or drug-trafficking crimes).

The GCA sets forth a narrower definition of "firearm" than the FFA did. Its definition, which governs all of "Chapter 44—Firearms," §§ 921–934, states that a "firearm" is:

Thomas, J., dissenting

"(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." § 921(a)(3).

Whereas the FFA had treated "any part or parts" of a firearm as a regulable firearm, the GCA deems only a firearm's "frame or receiver" to be firearm parts that qualify as a firearm in their own right. § 921(a)(3)(B).

Congress left the terms "frame" and "receiver" undefined. See § 921. Shortly after the GCA's enactment, the Bureau of Alcohol and Tobacco Tax Division[1] promulgated a regulation defining "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 33 Fed. Reg. 18558 (1968) (emphasis deleted).[2]

That regulatory definition made sense. At the time of the GCA's enactment, the term "frame" was generally understood to mean "the basic structure and principal component of a firearm." C. Mueller & J. Olson, Small Arms Lexicon and Concise Encyclopedia 87 (1968) (Olson's). And, the term "receiver" was generally understood to mean the "part of a gun that houses the breech action and firing mechanism." *Id.*, at 168. Thus, ATF's initial definition of "frame or receiver" accorded with the terms' ordinary meanings. See 33 Fed. Reg. 18558 ("[t]hat part of a firearm which provides

---

[1] The Bureau of Alcohol and Tobacco Tax Division was the predecessor entity to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). For the remainder of this opinion, I refer to the relevant agency at any time as "ATF."

[2] The GCA authorizes the Attorney General to "prescribe only such rules and regulations as are necessary to carry out" the statute. 18 U. S. C. § 926(a). The Attorney General has delegated this authority to ATF. See 28 CFR § 0.130(a) (2023).

housing for the hammer, bolt or breechblock, and firing mechanism").

ATF's definition also aligned with the GCA, because for "any weapon" to "expel a projectile by the action of an explosive," §921(a)(3)(A), the weapon must have both a mechanism that will initiate that explosion and a way to seal the firing chamber. In other words, the weapon must have a "frame" or "receiver." See Olson's 87, 168. Thus, by defining frame or receiver as the parts of a gun that provide "housing for the hammer, bolt or breechblock, and firing mechanism," 33 Fed. Reg. 18558, ATF's initial definition fit neatly into the statutory scheme. This understanding of "frame" and "receiver" governed for over 50 years.

But, ATF recently changed course, in an effort to regulate so-called ghost guns—*i.e.*, privately made firearms built from kits or collections of unfinished parts. To tackle what it perceived to be the "homeland security threat" posed by the "wide availability of ghost guns," the agency promulgated a rule redefining "firearm," "frame," and "receiver." Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24658 (2022) (Rule) (internal quotation marks omitted). Without any change to the statute, this Rule expanded the regulatory definition of "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 CFR §478.11 (2023). It also broadened the definition of "frame or receiver" to include "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." §478.12(c).

One of the Rule's critical innovations is the manner in which it allows ATF to determine whether an object is "clearly identifiable"—and thus regulable—as an unfinished frame or receiver:

> "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit."  *Ibid.*

"Prior to this rule, ATF did not examine templates, jigs, or other items and materials in determining whether partially complete frames or receivers were 'firearms' under the GCA."  87 Fed. Reg. 24668; see also Tr. of Oral Arg. 39–40 (acknowledging the change).  Instead, ATF looked to the object itself to determine whether it was sufficiently complete to constitute a regulable frame or receiver.  See, *e. g.*, App. 23 (2004 guidance letter from ATF explaining that the agency "evaluates the level of completion of the submitted sample . . . and makes a comparison with a sample of a completed firearm of the same type").  The new definition, however, expanded the meaning of "frame" and "receiver" to incorporate items entirely separate from the object itself. According to ATF, whether an unusable, unfinished piece of metal constitutes a regulable "frame or receiver" can turn on a manufacturer's "marketing materials."  87 Fed. Reg. 24668.

ATF offered one meager limit on its broad, new definitions: Under the Rule, "raw material," such as an "unformed block of metal" or "liquid polymer," will not constitute a regulable frame or receiver.  27 CFR § 478.12(c).

B

Before the Rule took effect, a group of individuals and manufacturers of weapon-parts kits filed a petition for review challenging the Rule's new definitions of "frame or receiver" and "firearm."  As relevant here, the plaintiffs alleged that the Rule exceeded ATF's "statutory jurisdiction,

authority, or limitations" under the Administrative Procedure Act (APA), 5 U. S. C. §706(2)(C). See Amended Petition for Judicial Review of Agency Action and Request for Declaratory Judgment and Injunctive Relief in No. 4:22–cv–691 (ND Tex., Oct. 5, 2022), ECF Doc. 93, p. 42 (alleging Rule's expansive definitions provided ATF "new, additional authority in excess of that proposed, considered, debated, or passed by Congress").

The District Court granted summary judgment to the plaintiffs and vacated the Rule. *VanDerStok* v. *Garland*, 680 F. Supp. 3d 741 (ND Tex. 2023). The Fifth Circuit affirmed in relevant part. *VanDerStok* v. *Garland*, 86 F. 4th 179 (2023). It held that ATF's redefinition of "frame or receiver" was an "impermissible extension of the statutory text," *id.*, at 189, and that the agency's attempt to redefine "firearm" to include a weapon-parts kit "stretche[d] the [statute's] words too far," *id.*, at 192. The Government's effort "to justify its unprecedented expansion of the GCA," the court explained, "collapses upon a cursory reading of the text." *Id.*, at 193.

Judge Oldham wrote separately to highlight the "staggering" implications of ATF's new position, particularly with respect to the AR–15, "the most popular rifle in America." *Id.*, at 208 (concurring opinion). Observing that the Rule regulates frames and receivers according to what they might become rather than what they are, and that an AR–15's semi-automatic receiver can "'readily be converted'" into a fully automatic receiver with relative ease, he concluded that, on ATF's logic, the Government may regulate AR–15s as machineguns. *Id.*, at 207–208. If ATF were correct, Judge Oldham cautioned, "then millions and millions of Americans would be felons-in-waiting." *Id.*, at 208.

This Court granted certiorari to decide two questions: whether the Rule's new definition for frames and receivers fits within the statutory definition of "frame or receiver" under the GCA, see §921(a)(3)(B); and whether the statutory term "firearm" can cover weapon-parts kits.

## II

Before turning to the questions presented, a threshold issue is the applicable legal standard for analyzing the plaintiffs' APA challenge. Applying traditional principles of statutory interpretation, the Fifth Circuit asked whether the Rule "conflicts with the plain language of the GCA" or "cast[s] a wider net than Congress intended." 86 F. 4th, at 190, 194. We took this case to determine whether the Fifth Circuit was correct to answer "yes." I would undertake the same inquiry as the Fifth Circuit and ask only whether the Rule contravenes "clear statutory text" or otherwise "exceeds the [GCA's] legislatively-imposed limits on agency authority." *Id.*, at 182.

The majority takes a different approach. Asserting that the plaintiffs conceded to having brought a " 'facial' " challenge, the Court "take[s]" this characterization "as given," and analyzes the challenge as a facial attack.[3] *Ante*, at 467. In particular, the Court assumes, *arguendo*, that the regulatory definitions are valid so long as they cover "at least some weapon parts kits." *Ante*, at 473. This approach superficially appears to apply a framework similar to that of *United States* v. *Salerno*, 481 U. S. 739 (1987). There, the Court explained that, to prevail in a "facial challenge" to a statute, the challenger must establish that "no set of circumstances exists under which the Act would be valid." *Id.*, at 745.

This approach seems plainly inapt in a challenge to a regulatory definition. "To 'define' is . . . 'to settle' or 'to establish or prescribe authoritatively.' " *Puerto Rico* v. *Franklin Cal.*

---

[3] While the Government characterized the plaintiffs' lawsuit as a facial challenge in passing, see *ante*, at 467, the parties did not seriously litigate the relevant standard, see *post*, at 514–515 (ALITO, J., dissenting). And, at oral argument, plaintiffs' counsel appeared to endorse a standard similar to the one that the Fifth Circuit applied. See Tr. of Oral Arg. 80 (arguing that ATF would have "gone beyond their authority" by defining "frame or receiver" to "include items that may readily be converted to frames or receivers").

*Tax-Free Trust*, 579 U. S. 115, 126 (2016) (quoting Black's Law Dictionary 380 (5th ed. 1979)); see also *id.*, at 534 (12th ed. 2024) (equating "define" with "To state or explain explicitly"; "[t]o fix or establish (boundaries or limits)"; and "[t]o set forth the meaning of (a word or phrase)"). The point of defining a term in a regulation is therefore to show what the law permits and what it prohibits. But, a regulatory definition that is accurate in only a single valid application cannot possibly "explain explicitly," "fix or establish," or "set forth the meaning" of a statutory term. *Id.*, at 534.

Consider a hypothetical statute that defines "motorcycle" as "a motor-powered, two-wheeled vehicle with pedals." If a regulatory definition copied the same language, and then added that "the term shall include any motorized vehicle," the regulatory definition obviously would be wrong. Not every motorized vehicle is a motorcycle, and the fact that *some* motorized vehicles happen to be motor-powered, two-wheeled vehicles with pedals does not suggest otherwise. It is difficult to see how an overbroad regulatory definition becomes defensible simply because some set of circumstances exists in which the regulatory definition overlaps with the statutory definition.[4]

───────────

[4] Dissenting in *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.*, 515 U. S. 687 (1995), Justice Scalia criticized the application of a similar standard as "unprecedented" in the context of challenges to regulatory definitions. *Id.*, at 731. Using an example of a statute prohibiting " 'premeditated killing of a human being,' " Justice Scalia explained that a challenge to an implementing regulation that prohibits " 'killing a human being' " "would not be rejected on the ground that, after all, it *could* be applied to a killing that happened to be premeditated." *Id.*, at 731–732. "It *could not* be applied to such a killing, because it does not require the factfinder to find premeditation, as the statute requires." *Id.*, at 732. In other words, the regulatory definition would be unlawful in every application because it allows the factfinder to determine liability without meeting the statute's requirements. A regulatory definition that incorporates terms exceeding the statutory text creates a similar problem, as it permits liability based on elements outside the statute's scope.

Treating challenges to regulatory definitions as "facial challenges" has substantial implications. If a regulatory definition survives APA challenge so long as just *one* item it covers also happens to be covered by the statute it purports to interpret, it is difficult to understand how an agency would ever promulgate an invalid definition. So long as it imports the definition Congress laid out in the statute, the agency can sweep in whatever additional conduct it wishes. No matter how far the agency expands its regulatory definition, the statutory definition inevitably will capture at least *some* of it.

To its credit, the majority attempts to confine the effects of its approach to the facts of this case. Because the majority assumes the relevant legal standard without deciding it, it refrains from mandating this framework. Rather, it rests on its conclusion that the plaintiffs essentially conceded that the facial-challenge standard applies, and it takes the application of that standard "as given" for this case only. *Ante*, at 467; see *ante*, at 468, n. 2 ("[W]e believe the better course is to leave further analysis of the proper test for another day and address the parties' dispute as they have chosen to frame it"). So long as lower courts do not equate an APA challenge with a "facial" one, they are free to disregard the majority's analysis and hold that the Rule exceeds ATF's statutory authority.[5]

_____

[5] Although the majority avoids settling whether the framework in *United States* v. *Salerno*, 481 U. S. 739 (1987), is appropriate for regulatory challenges in the APA context, the Court may one day have to decide this important question. This Court has at least occasionally applied the *Salerno* framework in regulatory challenges. See, *e. g.*, *Reno* v. *Flores*, 507 U. S. 292, 301 (1993); *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S. 183, 188 (1991). But, as Justice Alito observes, "neither decision explained why the *Salerno* rule should be extended in that way." *Post*, at 515 (dissenting opinion). If a regulation is so overbroad that it has only a single valid application, it would seem plainly "arbitrary" or "capricious" under the APA, 5 U. S. C. § 706(2)(A), making a *Salerno*-like inquiry inapposite. Perhaps the majority's analysis would differ if it were

## III

As for the questions presented, start with the question whether the Rule's new definition for frames and receivers can stand. Ordinary principles of statutory interpretation make plain that the Rule sweeps too far: The terms "frame" and "receiver" in §921(a)(3)(B) do not cover "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]." 27 CFR §478.12(c). The majority reaches a different conclusion based on several interpretive errors. Most notably, the majority proceeds under the faulty premise that our standard rules of statutory interpretation do not apply to "a word for a thing created by humans." *Ante,* at 470.

## A

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Marketing Institute* v. *Argus Leader Media,* 588 U. S. 427, 436 (2019). As relevant here, §921(a)(3) defines "firearm" to include "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," and "(B) the frame or receiver of any such weapon." Because the GCA defines neither "frame" nor "receiver," "'we give [each] term its ordinary meaning.'" *Encino Motorcars, LLC* v. *Navarro,* 584 U. S. 79, 85 (2018).

The parties agree that, in 1968, the terms "frame" and "receiver" were understood to refer to "'the basic structure and principal component of a firearm,'" and "the 'part of a gun that houses the breech action and firing mechanism.'" Brief

---

asking whether the Rule was arbitrary and capricious rather than whether it was "'in excess of statutory . . . authority.'" *Ante,* at 466. But, because the majority's approach is untenable for the reasons explained in this opinion, I leave the broader question of *Salerno*'s applicability in the APA context for another day.

for Petitioners 32 (quoting Olson's 87, 168); Brief for Respondent VanDerStok et al. 7 (same). But, ATF's Rule conflicts with this accepted meaning in at least two ways. First, it defines "frame or receiver" to include objects that are *not* frames or receivers, but that may be "converted" into them in the future. 27 CFR § 478.12(c). Second, it permits ATF to deem an object a frame or receiver based on "marketing materials" and other materials merely associated with it. *Ibid.*

1

The ordinary meaning of "frame or receiver" does not include objects that may be "converted" into a frame or receiver. *Ibid.* As the Government itself admits, the word "'convert'" means "'[t]o change into another form, substance, state, or product; transform; transmute.'" Brief for Petitioners 19–20 (quoting American Heritage Dictionary 291 (1969)). If an object can become a frame or receiver only after it is "change[d] into another form, substance, state, or product," it is difficult to understand how the object can be considered a frame or receiver even before the change occurs. *Ibid.* As the Fifth Circuit put it, "a part cannot be both *not yet* a receiver and a receiver at the same time." 86 F. 4th, at 190 (internal quotation marks omitted).

The structure of § 921(a)(3) confirms that objects that are not yet frames or receivers do not meet the statutory definition of "frame or receiver." § 921(a)(3)(B). Subsection (A) of § 921(a)(3) covers weapons that are not yet functional guns but that "may readily be converted" into them. And, the statute makes clear that subsections (C) (mufflers and silencers) and (D) (destructive devices), also cover more than finished, operable products. See § 921(a)(25) (defining "muffler" and "silencer" to include "any combination of parts . . . for use in assembling" such objects); § 921(a)(4)(C) (defining "destructive device" to include any "combination of parts" for "converting any device into any destructive device" described in the statute and "from which a destructive device

may be readily assembled"). In contrast, subsection (B) covers only a weapon's "frame or receiver."

"[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 452 (2002) (internal quotation marks omitted). This principle holds particular force here, where Congress applied broadening language to the subject matter of every subsection in §921(a)(3) *except* for subsection (B). Yet, in defining "frame" and "receiver" to include objects that "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," 27 CFR §478.12(c), the Rule transplants the "readily be converted" and "assembled" concepts from subsections (A), (C), and (D) into subsection (B)—the very provision from which Congress omitted them.

The straightforward reading of §921(a)(3) is the correct one: Subsection (B)'s omission of the readily converted and readily assembled concepts means that a "frame or receiver" does not include objects that are not yet frames or receivers. And, until promulgating the Rule, ATF agreed with this understanding:

> "Importantly, the 'designed to' and 'readily be converted' language are only present in the first clause of the statutory definition. Therefore, an unfinished frame or receiver does not meet the statutory definition of 'firearm' simply because it is 'designed to' or 'can readily be converted into' a frame or receiver. Instead, a device is a firearm either: (1) because it *is* a frame or receiver or; (2) it is a device that is designed to or can readily be converted into a device that 'expel[s] a projectile by the action of an explosive.'" Memorandum of Law in *Syracuse* v. *ATF*, No. 1:20–cv–06885 (SDNY, Jan. 29, 2021), ECF Doc. 98, p. 14 (Brief for ATF) (citation omitted).

See also *id.*, at 36–39 (explaining why "An Unmachined Frame or Receiver Cannot Be Readily Converted Into a Device that Expels a Projectile"). ATF was right the first time.

Tellingly, ATF's new interpretation seems to invite "staggering" consequences. 86 F. 4th, at 208 (Oldham, J., concurring). The NFA defines "'machinegun'" as "any weapon which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger," and "include[s]" in that definition "the frame or receiver of any such weapon." 26 U. S. C. §5845(b). ATF has defined "frame or receiver" in the NFA to "have the same meaning as in §478.12"—the provision that defines those terms under the GCA. 27 CFR §479.11. And, although an unmodified AR–15 is a semiautomatic weapon, "every single AR–15 can be converted to a machinegun using cheap, flimsy pieces of metal—including coat hangers." 86 F. 4th, at 208 (Oldham, J., concurring).

If an object already is what it may be converted into, 27 CFR §478.12(c), then semiautomatic AR–15s would seem to be partially complete, automatic machineguns. This reasoning exposes the manufacturers, sellers, and owners of AR–15s to criminal liability under the NFA. See 26 U. S. C. §§5861, 5871. But, Congress does not "hide elephants in mouseholes." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001). An interpretive approach that would allow ATF to regulate the most popular *semiautomatic* rifle in America under a statute addressing *automatic* machineguns should give us pause. Cf. *Dubin* v. *United States*, 599 U. S. 110, 130 (2023) ("Time and again, this Court has prudently avoided reading incongruous breadth into opaque language in criminal statutes").

2

The Rule's definitions of "frame" and "receiver" also contravene ordinary meaning by allowing ATF to classify ob-

THOMAS, J., dissenting

jects as frames or receivers based on criteria other than the object's physical characteristics. Under the Rule, any "tools, instructions, guides, or marketing materials" that are "made available by the seller" can convert an unregulated piece of metal into a regulated "frame or receiver." 27 CFR § 478.12(c). Put another way, the mere presence of things distinct from the object at issue can somehow transform the character of the object itself.



Figure 1. See Dept. of Justice, ATF, Open Letter to All Federal Firearms Licensees 3, 6 (Sept. 27, 2022), https://www.atf.gov/firearms/docs/open-letter/all-ffls-september-2022-impact-final-rule-2021-05f-partially-complete-ar/download.

Figure 1, *supra*, illustrates the Rule in action. Both images in Figure 1 depict unfinished receivers. Both lack machining and indexing in the key areas. The only difference

is the presence of a jig and drill bits. Yet, according to the Rule, these extraneous items make an unfinished receiver a regulable firearm.

The presence of items such as jigs or "marketing materials"—that are not, and never could be, part of a frame or receiver—has no bearing on whether a piece of metal or plastic constitutes "the basic structure and principal component of a firearm." Olson's 87. Because those extrinsic items have no impact on the ordinary meanings of "frame" or "receiver," the regulatory definition exceeds statutory text by using such items to expand the scope of those statutory terms. Cf. *Encino Motorcars*, 584 U. S., at 85 (an undefined statutory term receives its ordinary meaning).

B

The majority leaves the issue of extrinsic objects for another day, deeming the issue irrelevant under its questionable facial-challenge standard. *Ante*, at 484. The majority thus defends only the Rule's coverage of items that *may become* frames or receivers. To do so, it substitutes novel linguistic labels for traditional statutory interpretation; mistakes outlier definitions for exemplars; and improperly imports attributes of one provision into another.

1

The majority's statutory analysis deviates dramatically from the "careful examination of the ordinary meaning and structure of the law itself" that is typically at the core of this Court's interpretive approach. *Food Marketing Institute*, 588 U. S., at 436. Drawing heavily from an *amicus* brief and an academic paper,[6] the majority asserts that "the

---

[6] See Brief for Professors and Scholars of Linguistics and Law as *Amici Curiae*; S. Grimm & B. Levin, Artifact Nouns: Reference and Countability, in 2 Proceedings of the Forty-Seventh Annual Meeting of the North East Linguistic Society 55 (2017) (Grimm).

terms 'frame' and 'receiver' in subsection (B) are artifact nouns," *ante*, at 479—that is, they are words for "thing[s] created by humans," *ante*, at 470. The majority argues that this type of noun is flexible enough to encompass unfinished objects. It explains that, in casual conversation, one might refer to an artifact noun such as an "unfinished manuscript" as a "*novel*," or an unassembled piece of furniture from IKEA as a "*table*." *Ante*, at 470–471. Thus, the majority argues, a "frame" or "receiver" "may sometimes describe not-yet-complete" frames or receivers. *Ante*, at 479.

It is beside the point whether, in casual conversation, some people might use "a word for a thing created by humans" to discuss unfinished versions of that "thing." *Ante*, at 470. "In statutory drafting, where precision is both important and expected, the sort of colloquial usage on which the [majority] relies is not customary." *Allison Engine Co.* v. *United States ex rel. Sanders*, 553 U. S. 662, 670 (2008). We have expressly "presumed" that Congress does *not* "draft its laws" with the informality of "casual conversation." *Arcadia* v. *Ohio Power Co.*, 498 U. S. 73, 79 (1990).

Thus, we must evaluate the Rule's redefinition of "frame" and "receiver" based on the GCA's "entire statutory scheme," *Winkelman* v. *Parma City School Dist.*, 550 U. S. 516, 523 (2007), not the "'stereotypical' conversational background" on which the majority relies, Grimm 58. That scheme—as reflected in the GCA's text, context, and structure—confirms that unfinished objects in a weapon-parts kit do not meet § 921(a)(3)(B)'s terms. *Supra*, at 497–502. Dressing up colloquial usage with the "artifact noun" label cannot override this conclusion.[7]

---

[7] The majority suggests that I "dismiss the possibility that Congress might use an artifact noun in a way that encompasses incomplete objects," and then defends its reliance on the artifact noun as just another way to discern a statute's "'ordinary meaning.'" *Ante*, at 477, n. 4. I do not doubt that Congress might sometimes intend to describe an incomplete

2

The majority further argues that, because "§ 923(i) uses the phrase 'frame or receiver' to reach some unfinished and unconventional frames and receivers," such as the "frame" or "receiver" of a muffler or silencer, it is reasonable to interpret § 921(a)(3)(B) to also cover unusual frames or receivers. *Ante,* at 479–480. The majority's conclusion does not follow its premise.

Section 921(a)(3)(C) defines a firearm to include "any firearm muffler or firearm silencer." Section 923(i) requires licensed importers and manufacturers to place a serial number on a firearm's "receiver or frame." To reconcile § 921(a)(3)(C) with § 923(i)'s requirement, mufflers and silencers must have a "receiver or frame" even though they do not as a matter of ordinary meaning. Thus, by regulation, ATF deems a muffler's or silencer's "outer tube or modular piece" to be its "frame or receiver." 27 CFR § 478.12(b).

In the context of mufflers and silencers, the terms "frame" and "receiver" have context-specific meanings that cannot be generalized to other provisions in Chapter 44. As ATF explained, "[u]nder the GCA, licensed manufacturers and importers must identify the frame or receiver of each firearm, including a firearm muffler or silencer, with a serial number

---

object with "a word for a thing created by humans," *ante,* at 470, or that courts may legitimately give effect to that intent. But, my point is that when courts determine whether a word refers to an incomplete or finished object, they apply traditional methods of statutory interpretation to ascertain what "Congress intended to cover and did cover" in the relevant statutes, *United States* v. *Citroen,* 223 U. S. 407, 424 (1912), not what "[a] friend" might have meant in casual conversation, *ante,* at 471. In other contexts, such as trade law, courts applying those methods have found that Congress intended to treat incomplete versions of commercial products differently from their completed counterparts. See, *e. g., Citroen,* 223 U. S., at 422–423 (applying different tariffs to pearls predrilled for use as necklaces than to pearls that were already strung into a necklace). We cannot invoke the concept of the "artifact noun" to displace this traditional statutory analysis.

in accordance with regulations." 87 Fed. Reg. 24660. Calling an "outer tube or modular piece" of a muffler or silencer a "frame or receiver" thus may be justified as an attempt to square § 923(i) with Congress's decision to include mufflers and silencers within the definition of "firearm" under § 921(a)(3)(C). Cf. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 228 (2012) (Scalia & Garner) (explaining that context may, in rare circumstances, justify overriding a term's established meaning). But, the presumption of consistent usage is "particularly defeasible by context," see *id.*, at 171, and there is no reason to think that the agency's workaround for applying § 923(i) to mufflers and silencers should alter the ordinary meanings of "frame" and "receiver" in *other* statutory provisions that do not implicate the same problem. In this case, the statutory scheme makes clear that § 921(a)(3)(B)'s "frame or receiver" language does not include unfinished, inoperable objects even if one day they may become frames or receivers. *Supra*, at 498–500.

3

The majority further asserts that "reading subsection (B) in light of subsection (A)" actually "undermine[s]" the plaintiffs' position. *Ante*, at 482. Again, subsection (A) covers any weapon which "may readily be converted" into a functional gun. § 921(a)(3)(A). Subsection (B) specifies that a firearm includes the "'frame or receiver *of any such weapon.*'" *Ante*, at 482 (emphasis added by majority). According to the majority, that reference in subsection (B) implicitly incorporates subsection (A)'s readily converted language. And, because subsection (A) covers "starter guns and disassembled rifles" that are "not yet fit for effective use in combat," *ibid.*, the majority argues that subsection (B) should also cover objects that are not yet usable. That conclusion does not follow.

The frames and receivers referred to in subsection (B) are components of the "weapon[s]" referred to in subsection (A).

While the majority is correct that subsection (A)'s readily converted language covers weapons "not yet fit for effective use in combat," *ibid.*, there is no reason to think that the readily converted language in subsection (A) applies to the component parts described in subsection (B)—and every reason to think they do not. ATF recognized as much just a few years ago, explaining that "the 'designed to' and 'readily be converted' language are only present in the first clause of the statutory definition. Therefore, an unfinished frame or receiver does not meet the statutory definition of 'firearm' simply because it is 'designed to' or 'can readily be converted into' a frame or receiver." Brief for ATF 14 (citation omitted). The majority's examples of "starter guns and disassembled rifles," *ante*, at 482, underscore the point that an inoperable weapon does not imply an inoperable frame or receiver: While neither type of weapon is "fit for effective use in combat," *ibid.*, their frames and receivers are typically operable.

"We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 341 (2005). Rather than import language from one provision (subsection (A)) into another that conspicuously omits that language (subsection (B)), the Court should acknowledge that, naturally read, subsection (B) is not broadened by language omitted from it but included in the more expansive text of subsection (A).

IV

The Court also granted certiorari to decide whether a "firearm" can "include a weapon parts kit." 27 CFR §478.11. Statutory text, context, and structure confirm that this aspect of the Rule also exceeds the scope of the statute.

The majority's novel artifact-noun methodology cannot alter this conclusion.

## A

Section 921(a)(3)(A)'s definition of "firearm" includes "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Thus, while an object that "may readily be converted" into a gun qualifies as a "firearm" if that object is *already* a "weapon," an object that is not already a weapon does not.

The ordinary meaning of "weapon" does not include weapon-parts kits. At the time of the GCA's enactment, the word "weapon" was understood to mean "an instrument of offensive or defensive combat . . . something to fight with . . . something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy." Webster's Third New International Dictionary 2589 (1966) (Webster's); accord, *ante,* at 470. A weapon-parts kit is not a weapon until it is converted into an operable gun. It is no more "something to fight with," Webster's 2589, than the sort of "unformed block of metal" that the Rule expressly exempts from regulation, see 27 CFR § 478.12(c). The operable gun pictured in the majority opinion is "an instrument" one may use in "combat." The unfinished, inoperable kit pieces are not. See *ante,* at 469 (images). Because these pieces do not constitute a "weapon," they do not fit within subsection (A)'s statutory definition.

Statutory text and context reinforce this conclusion, as they indicate that the "weapon" contemplated in subsection (A) must have a "frame or receiver"—precisely the parts of a weapon that weapon-parts kits omit. Section 923, for example, requires manufacturers to identify their firearms "by means of a serial number engraved or cast on the receiver or frame *of the weapon,*" § 923(i) (emphasis added), clearly implying that any such "weapon" includes a "receiver or frame." Section 921 supports this reading by delimiting the definition of a "firearm" to "any weapon" convertible into a

functional gun, and "the frame or receiver *of any such weapon*," §§ 921(a)(3)(A)–(B) (emphasis added). This provision again assumes that the "weapon" in subsection (A) has a "frame or receiver."

That "starter guns and disassembled rifles" are prototypical illustrations of things covered under § 921(a)(3)(A) that nevertheless "are not yet fit for effective use in combat," *ante*, at 482, underscores this conclusion. Both starter guns and disassembled rifles usually have functional frames or receivers. In contrast, the frames and receivers included in weapon-parts kits are unfinished, inoperable, and so cannot constitute frames or receivers under subsection (B). See *supra*, at 497–502. Since "any weapon" must have an operable "frame or receiver," § 921(a)(3)(B), a weapon-parts kit cannot be a "weapon." Accordingly, it cannot become a regulated "firearm" under § 921(a)(3)(A).[8]

Further, although the FFA previously regulated "any part or parts" of a gun, 52 Stat. 1250, Congress limited the GCA's coverage to only two such parts: "the frame or receiver," § 921(a)(3)(B). "Presumably, Congress singled out these components for special treatment because of the special role they play in constructing firearms." *Ante*, at 465. We should "presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992).

The statute's broader context also suggests that weapon-parts kits are not regulable "firearms." Section 921(a)(3) defines "firearm" for all of Chapter 44. It follows that, "if

---

[8] Of course, starter guns are deliberately *not* designed for combat. See *ante*, at 471 (explaining that a starter gun "fires blanks, not bullets," is used "at sporting events, not in combat," and typically requires "using a power tool" to convert it into an operable weapon). Congress's parenthetical inclusion of "a starter gun" as "any weapon" is therefore best understood to incorporate an outlier, "counterintuitive definitio[n]," not to expand the definition of "weapon" to include other items outside its ordinary meaning. Scalia & Garner 232; see *Babbitt*, 515 U. S., at 719 (Scalia, J., dissenting).

[Chapter 44] is to be interpreted as a symmetrical and coherent regulatory scheme," *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 569 (1995), the term should to the extent possible receive a consistent meaning. While it is not difficult to envision how weapons that can be immediately *assembled* might be helpful "during and in relation to any crime of violence" under § 924(c)—also part of Chapter 44—it is hard to imagine how an unfinished weapon-parts kit requiring *conversion* could be helpful. At minimum, this understanding would seem to imply a crime "during" which the criminal could take some untold amount of time to convert his kit into a functional gun before using it. That does not fit any crime of violence with which I am familiar. Cf. *Babbitt* v. *Sweet Home Chapter, Committee for Great Ore.*, 515 U. S. 687, 722–723 (1995) (Scalia, J., dissenting) ("[T]he Secretary's interpretation of 'harm' is wrong if it does not fit with the use of 'take' throughout the Act. And it does not").[9]

B

Holding otherwise, the majority reasons that, as a "thing created by humans," the term "weapon" may encompass not only weapons that are "combat ready," but also those that are "disassembled," and that the term thus captures weapon-

---

[9] Section 924(c) is not the only provision in Chapter 44 that poses problems for a definition of "firearm" that includes weapon-parts kits. Other provisions make clear that a "firearm" is something that may be "unloaded." See, *e. g.*, § 926A. But, a weapon-parts kit cannot fire a bullet prior to machining and assembly, so whether an unexpended bullet is present in the kit's inoperable firing chamber or magazine is irrelevant. Chapter 44 also makes clear that a "firearm" is an object one may "carry . . . concealed." § 926B. Unlike a functional gun, however, a kit is a collection of unfinished parts, screws, and jigs. See *ante*, at 469 (images). The notions of concealed carry and open carry in the context of weapon-parts kits are inapposite. And, while a person might use a functional gun to "kil[l]" another during the "commission of a crime" in a federal facility, see §§ 930(b), (c), the lethality of an unfinished weapon-parts kit is no different from that of an "unformed block of metal" exempted under the Rule, 27 CFR § 478.12(c).

parts kits "[i]n the same way and for the same reason."
*Ante*, at 471.   The majority again conjures up the "artifact
noun" to support an interpretation that is incompatible with
our traditional methods of statutory construction.   See
*supra*, at 506–509.

Unlike a disassembled firearm, a weapon-parts kit requires
more than merely assembling the parts to become a func-
tional gun.   Special tools and an indeterminate amount of
time are required to convert an unfinished weapon-parts kit
into a functional weapon.   Thus, even assuming that the or-
dinary meaning of "weapon" does not resolve whether the
term includes weapon-parts kits, at minimum the term
"weapon" cannot encompass weapon-parts kits in "the same
way" it covers disassembled firearms.   *Ante*, at 471.

The majority also insists that the term "weapon" should
cover "some unfinished instruments of combat" like weapon-
parts kits because §921(a)(3)(A) includes starter guns,
which, like weapon-parts kits, can be converted into func-
tional weapons.   *Ante*, at 471.   But, because a starter gun
does not fit within the ordinary meaning of "weapon," Con-
gress's decision to expand that term to cover that one, spe-
cific object does not imply that Congress intended the word
"weapon" to also cover *other* objects that are not already
weapons.   See n. 8, *supra*.

And, both a disassembled rifle and a starter gun are
"weapons" for the reason a weapon-parts kit is not: Disas-
sembled rifles and starter guns typically have functional
frames or receivers.   See *supra*, at 508.[10]

_____

[10] The majority observes that "not every 'firearm' will be capable of im-
plicating every criminal law discussing firearms" because Congress
broadly defined the term "firearm" to include objects—like frames and
silencers—that fall outside that term's ordinary meaning.   *Ante*, at 476.
But, as previously shown in the context of starter guns, see n. 8, *supra*,
Congress's decision to provide a statutory term with specific "counterintu-
itive definitions" does not license courts to reinterpret the term however
they see fit.   Scalia & Garner 232.   And, while the majority identifies
specific firearms laws that can coherently apply to weapon-parts kits,

## V

The text, context, and structure of §921(a)(3) leave little doubt that weapon-parts kits are not "firearms," and that the unfinished contents of these kits are neither "frame[s]" nor "receiver[s]." But, even if it were reasonable to treat artifact nouns differently, the Government would—at most—demonstrate statutory ambiguity. And, when a statute with criminal applications is ambiguous, the rule of lenity applies. See *Leocal* v. *Ashcroft*, 543 U. S. 1, 12, n. 8 (2004).

This case is similar to *United States* v. *Thompson/Center Arms Co.*, 504 U. S. 505 (1992). There, a majority of the Court applied the rule of lenity to interpret a tax statute with criminal applications. That case presented the question whether a gun manufacturer "makes" short-barreled rifles—and is thus subject to the NFA's "making tax," see 26 U. S. C. §5821—by selling a pistol and conversion kit from which one could make a short-barreled rifle. See 504 U. S., at 507 (plurality opinion). After considering several arguments—including analogies to products that "requir[e] some home assembly," and comparisons to terms referring to "'any combination of parts'"—the plurality concluded that it was "left with an ambiguous statute." *Id.*, at 509–517. And, because the provision carried the threat of criminal sanction, the plurality held that it was "proper . . . to apply the rule of lenity and resolve the ambiguity in Thompson/Center's favor." *Id.*, at 518.

Justice Scalia concurred in the judgment. Whereas the plurality found ambiguity in the conversion kits' potential

*ante*, at 476, that overlap does not diminish the tensions I have described above, see *supra*, at 508–509. Our job is to ensure a "coherent and consistent" statutory scheme "to the extent possible." *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 222 (2008). That Congress's "capacious" definition of "firearm" already generates some tension in the statute, see *ante*, at 476–477, is no reason to exacerbate that tension with a definition that makes Chapter 44 a less "symmetrical and coherent regulatory scheme," *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 569 (1995).

uses, he attributed the ambiguity to a "much more funda-
mental" question: "[W]hether the making of a regulated
firearm includes the manufacture, without assembly, of com-
ponent parts where the definition of the particular firearm
does not so indicate." *Id.*, at 519. He found persuasive the
contrast between the definition of regulated objects that ex-
pressly included "any combination of parts," and those that
did not. See *id.*, at 519–520 (noting that the provision at
issue "conspicuously combine[s] references to 'combination of
parts' in the definitions of regulated silencers, machineguns,
and destructive devices with the absence of any such refer-
ence in the definition of regulated rifles"). Because neither
the definition of "rifle" nor that of "shortbarreled rifle" incor-
porated combinations of parts, these distinctions made clear
that the NFA "d[id] not encompass Thompson/Center's pistol
and conversion kit, or at least d[id] not do so unambigu-
ously." *Ibid.*

I would take Justice Scalia's approach here. Nothing in
the GCA suggests that the terms "frame" and "receiver" also
include the materials that one could use to create them,
or that parts including neither a frame nor a receiver could
constitute a "weapon." See 18 U. S. C. §§ 921(a)(3)(A)–(B).
There are, however, many reasons to conclude the opposite.
See *supra*, at 497–510; cf. *Thompson/Center*, 504 U. S., at
519–520 (opinion of Scalia, J.).

Even the Government appears to have found these com-
peting interpretations persuasive just a few years ago. See
Brief for ATF 14, 36–39 (endorsing the position it now re-
jects). "Now it says the opposite. The law hasn't changed,
only an agency's interpretation of it." *Guedes* v. *ATF*, 589
U. S. ——, —— (2020) (statement of Gorsuch, J., respecting
denial of certiorari). I would apply the rule of lenity here.

\*    \*    \*

Congress could have authorized ATF to regulate any part
of a firearm or any object readily convertible into one. But,

it did not. I would adhere to the words Congress enacted. Employing its novel "artifact noun" methodology, the majority charts a different course that invites unforeseeable consequences and offers no limiting principle. I respectfully dissent.

JUSTICE ALITO, dissenting.

The Court decides this case on a ground that was not raised or decided below and that was not the focus of the briefing or argument in this Court. Specifically, the Court concludes (1) that respondents mounted a "facial" challenge to a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) rule implementing provisions of the Gun Control Act of 1968, (2) that a party making such a challenge must meet the test that applies when a statute is challenged as facially unconstitutional (what I will call the *Salerno* test[1]), and (3) that respondents cannot satisfy that demanding test.[2] If I were satisfied that the *Salerno* test should control here, I would join the opinion of the Court. The Court points to a gun kit that is all-but-assembled, *ante*, at 468–469, and a frame that is as close to completion as possible, *ante*, at 479–480. As applied to those extreme situations, the Court holds—and I agree—the rule does not deviate from the statute. But I am not certain that the *Salerno* test should govern.

I

Respondents' petition for review in this case claimed, among other things, that the ATF rule goes beyond what the Gun Control Act permits and that it should therefore be "set aside" under § 706(2) of the Administrative Procedure Act, 5

---

[1] See *United States* v. *Salerno*, 481 U. S. 739, 745 (1987).

[2] Under that test, "a plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would be valid, or he shows that the law lacks a plainly legitimate sweep." *Moody* v. *NetChoice, LLC*, 603 U. S. 707, 723 (2024) (alterations and internal quotation marks omitted).

U. S. C. § 706(2)(C).　See Amended Petition for Review in No.
4:22–cv–00691 (ND Tex.), ECF Doc. 93, pp. 41–42.　In the
Fifth Circuit and other Courts of Appeals, that provision has
long been understood to permit a court to hold that a rule is
invalid *in toto.*[3]　Thus, in both the District Court and the
Court of Appeals, the parties appear to have proceeded on
the assumption that the question presented was simply
whether the ATF rule exceeded the agency's authority under
the Gun Control Act.　The Government defended the rule
as a correct interpretation of those statutory provisions and
made no mention of the *Salerno* test.[4]　And for the most
part, that was the position advanced in the Government's
briefs in this Court.　As the Court points out, however, one
paragraph of the Government's brief did make the *Salerno*
argument.　See Brief for Petitioners 27–28.　But other than
quoting language in *INS* v. *National Center for Immigrants'
Rights, Inc.*, 502 U. S. 183, 188 (1991) (*NCIR*), the brief made
no effort to explain *why* that test should apply.　And per-
haps because of this cursory treatment, none of the respond-
ents addressed the *Salerno* issue in their briefs or during
oral argument.　Noting this silence, the Court regards the
applicability of the *Salerno* test as undisputed, and it then
proceeds to apply that test.　*Ante*, at 467.

　On the record here, I would not hold that respondents
agreed that the *Salerno* test should apply.　The Court relies
on the use of the term "facial" in their complaints, but that
characterization of their challenges did not constitute agree-
ment with the proposition that a facial challenge to a regula-

---

[3] See K. Mizelle, To Vacate or Not To Vacate: Some (Still) Unanswered
Questions in the APA Vacatur Debate, 2023 Harv. J. L. & Pub. Pol'y Per
Curiam 1, 3–4, and nn. 20–26.

[4] See Brief for Appellants in *VanDerStok* v. *Garland*, No. 23–10718
(CA5), ECF Doc. 77–1, pp. 18–32; Defendants' Combined Brief in Opposi-
tion to Original Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary
Judgment and in Support of Defendants' Cross-Motion for Summary Judg-
ment in *Vanderstok* v. *Garland*, No. 4:22–cv–00691 (ND Tex.), ECF Doc.
181, pp. 40–45.

tion must satisfy the *Salerno* test. And in fact respondents never conceded that point. They did not address the issue at all in their briefs, and at no point during the lengthy oral argument in this case were they asked about that question. Holding that they conceded the point is unwarranted and extremely unfair. And in any event, we should adjudicate a facial challenge under the right test regardless of the parties' arguments. See *Moody* v. *NetChoice, LLC*, 603 U. S. 707, 779–780 (2024) (ALITO, J., concurring in judgment).

## II

That brings me to the question whether the *Salerno* test should apply. In *Moody*, I set out what I saw as the chief reasons for using that test when a statute is challenged as unconstitutional. See 603 U. S., at 777–778 (opinion concurring in judgment). One of the most important of these is respect for the lawmaking authority of the legislative body that enacted the law in question. *Id.*, at 777. A law passed by Congress or a State Legislature should not be held to be entirely unenforceable just because it would be unconstitutional to apply it in just a few situations. That would represent unjustified judicial interference with the authority of the body entrusted under the Federal Constitution or the constitution of a State with the authority to make law.

This threat to legislative authority is not present when a regulation is challenged. I recognize that two of our decisions support the use of the *Salerno* test in cases involving facial challenges to rules. See *Reno* v. *Flores*, 507 U. S. 292, 301 (1993); *NCIR*, 502 U. S., at 188. But neither decision explained why the *Salerno* rule should be extended in that way, and in neither case did the Court grapple with the question that has recently arisen regarding the scope of a court's authority under § 706(2) of the APA.

Applying the *Salerno* rule in a case in which a rule is challenged under that provision as exceeding the agency's statutory authority may have far-reaching consequences.

As a commentator has observed, "*Salerno* would seem to
dictate that a plaintiff [who challenges a rule] cannot ever
win unless he can show that there is 'no set of circumstances'
in which the regulation would be consistent with the statute.
And because it would take an extraordinarily obtuse agency
to write a regulation so completely wrong as that, applying
*Salerno* in the statutory context would seem to dictate that
plaintiffs would always lose."   S. Buck, *Salerno* vs. *Chevron*:
What To Do About Statutory Challenges, 55 Admin. L. Rev.
427, 438 (2003).   Thus, this extension of *Salerno* would rep-
resent a huge boon for the administrative state.

It would also all but settle the debate about whether
§ 706(2) of the APA authorizes a court to render a rule unen-
forceable across the board.[5]   Respondents asserted a typical
claim seeking to have a rule "set aside" in its entirety under
§ 706(2), and if that claim fails because there are at least some
situations in which the application of the rule would be law-
ful, then it seems to follow that virtually all such claims will
fail as well.   The understanding of the "set-aside" power
that has long been prevalent in the courts of appeals will be
overturned, and parties who may be adversely affected by a
rule will be reduced to filing as-applied challenges.   Perhaps
that is what the law calls for, but we should not effect such
a change without thorough briefing and argument.

For these reasons, I must respectfully dissent.   I would
either direct the parties to brief the *Salerno* issue or vacate
the judgment below and remand so that the issue can be
addressed first by the Court of Appeals.[6]

---

[5] Compare J. Harrison, Vacatur of Rules Under the Administrative Pro-
cedure Act, 40 Yale J. on Reg. 119, 120 (2023) (arguing that the APA does
not confer that power), with M. Sohoni, The Power To Vacate a Rule, 88
Geo. Wash. L. Rev. 1121, 1122, 1126 (2020) (taking the opposite position);
see also Mizelle, 2023 Harv. J. L. & Pub. Pol'y, at 2–10 (summarizing the
debate).

[6] JUSTICE SOTOMAYOR's suggestion that I have mischaracterized what
the Court has held, *ante*, at 486 (concurring opinion), demands a response.
Although JUSTICE SOTOMAYOR obviously wishes that the Court had gone

Page Proof Pending Publication

---

further, all that the Court has actually held is that the ATF rule is not facially invalid because at least some applications of the rule are consistent with the statute. And the two examples that the Court cites are (1) a kit that contains all the parts needed to make a semiautomatic pistol and that can be assembled in 21 minutes, see *ante*, at 468–473, and (2) a frame that can be made functional simply by clipping off two plastic tabs and drilling a few holes, *ante*, at 477–479, 481. The Court has not held that any other kits or presently non-functional receivers are covered.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 470, line 8: "English" is deleted
p. 470, line 8: "of Current English" is inserted after "Dictionary"
p. 475, line 2: "kits" is deleted
p. 493, line 10: "*VanDerStok* v. *Garland,*" is inserted before 680
p. 493, line 11: "*VanDerStok* v. *Garland,*" is inserted before 86
p. 504, line 9: "firearm" is inserted before "silencer"